2006 ME 84

ADVANCED CONSTRUCTION
CORPORATION et al.

v.

Michael PILECKI et al.

Supreme Judicial Court of Maine.

Submitted on Briefs: Jan. 20, 2006.

Decided: July 13, 2006.

Brett D. Baber, Esq., Bangor, for plaintiffs.

David F. Szewczyk, Esq., Bangor, for defendants.

Panel: CLIFFORD, DANA, ALEXANDER, CALKINS, LEVY, and SILVER, JJ.

CALKINS, J.

[¶ 1] Advanced Construction Corporation and Aaron Spence appeal from a judgment entered in the Superior Court (Penobscot County, *Mead, J.*) in favor of Michael and Christine Pilecki, following a jury trial. Advanced brought several claims against the Pileckis, who filed claims against Advanced and Spence, all stemming from a home construction project. After the trial and post-judgment motions, the end result was (1) judgment for the Pileckis against Advanced in the amount of $10,415.80 on claims of breach of contract, breach of warranties, and negligence; (2) judgment for the Pileckis against Advanced and Spence, jointly and severally, in the amount of $23,789.46, for violations of the Home Construction Contracts Act (HCCA), 10 M.R.S. §§ 1486–1490 (2005); the Unfair Trade Practices Act (UTPA), 5 M.R.S. §§ 205–A to 214 (2005); and the Uniform Deceptive Trade Practices Act (DTPA), 10 M.R.S. §§ 1211–1216 (2005);[1] (3) judgment for the Pileckis

---

1. Advanced and Spence do not raise the issue of whether monetary damages are available for HCCA or DTPA claims. *See* 10 M.R.S. § 1213 (2005) (providing that the remedy available pursuant to the DTPA is an injunction); 10 M.R.S. § 1490(2) (2005) (providing that the remedy available pursuant to the HCCA is a forfeiture of not less than $100 and not more than $1000). Regardless, monetary damages are authorized for violations of the

against Spence in the amount of $1271.25 for abuse of process; (4) judgment for Advanced on its quantum meruit claim but no damages awarded; (5) judgment for Advanced against the Pileckis in the amount of $987.26 for conversion; and (6) an award of attorney fees to the Pileckis on the UTPA violation in the amount of $44,594.25.

[¶ 2] Advanced and Spence raise numerous issues on appeal, including several evidentiary rulings, but we discuss only the following issues: (1) the personal liability of Spence; (2) the court's refusal to give a jury instruction requested by Advanced and Spence that a contractor has a right to stop work for nonpayment; (3) the sufficiency of the evidence on the abuse of process claim; and (4) the attorney fee award.[2] We affirm the judgment.

## I. BACKGROUND

[¶ 3] On June 1, 2002, Advanced and the Pileckis signed a home construction contract, which provided that Advanced would construct a house on land in Corinth for $94,290. Spence, who is the sole shareholder of Advanced, signed the contract as the president of Advanced. The contract provided that the work was to commence in August 2002 and be completed by October 2002. The Pileckis told Spence that time was of the essence because of their lack of housing.

[¶ 4] The Pileckis obtained a home construction loan from Wells Fargo Home Mortgage. Advanced was required to complete a number of documents for Wells Fargo, and there is evidence that in the builder validation statement, Spence falsely stated that he had never filed for bankruptcy. In order for funds to be disbursed to Advanced, Wells Fargo required both Advanced and the Pileckis to sign draw requests. Advanced was required to certify that it had paid suppliers for the items in the draw requests and that it waived any right to assert a lien with regard to those items. Wells Fargo sent an inspector to examine the progress on the home after each properly signed draw request.

[¶ 5] Construction on the residence did not begin until November 2002. Thereafter, Advanced received a check from Wells Fargo for $16,972.20, and another check for $13,672.05, but neither was for the full amount of the draw requests Advanced had submitted. The $13,672.05 check was payment in full for the trusses Advanced purchased from McLaughlin Roof Trusses. Later, Advanced submitted two additional draw requests, but it received no further payment from Wells Fargo because neither draw request was signed by the Pileckis. The fourth and final draw request was for the electrical rough-in, which had not been completed. After the fourth draw request, the Pileckis informed Wells Fargo that they refused to sign any further draw requests.

[¶ 6] On January 17, 2003, Advanced stopped work on the Pileckis' house. Advanced filed a mechanic's lien on the property for $34,750. It subsequently issued an invoice, which Spence testified was the

UTPA, 5 M.R.S. § 213(1) (2005), and the three statutory violations served as alternative theories for awarding the Pileckis $23,789.46 in damages.

2. Advanced and Spence also contend that the Pileckis failed to prove that their damages were caused by violations of the HCCA, the UTPA, and the DTPA. The UTPA requires a plaintiff to have suffered a "loss of money or property" as the result of a violation of the Act in order to recover. 5 M.R.S. § 213(1); *VanVoorhees v. Dodge*, 679 A.2d 1077, 1082 (Me.1996). There was competent evidence that Spence's representations to the Pileckis and his conduct before, during, and after the work on their residence caused their damages.

support for the lien claim Advanced had filed. The invoice billed the Pileckis for items that had been included in the draw requests, such as the trusses and the electrical rough-in, and for items that had not been included in the draw requests.

[¶ 7] The parties dispute how much work had been done on the house at the time Advanced stopped working. The Pileckis estimated that the house was twenty-five to thirty-three percent complete, and Spence estimated that it was sixty percent complete. Even though Spence told the Pileckis that he and Advanced could construct the residence according to the Pileckis' plans, Spence and Advanced failed to follow the building plan and contract in several regards. There is also evidence that Spence installed different windows than the brand requested by the Pileckis; that Spence installed the wrong type of roof trusses, which eliminated two closets and the use of a loft, and made the second floor uninhabitable; and that Spence altered some of the roof trusses, which rendered the manufacturer's warranties invalid.

[¶ 8] This litigation began when McLaughlin Roof Trusses sued Spence and the Pileckis to enforce a lien and collect over $10,000, which it claimed was due and owing for the trusses.[3] Spence cross-claimed against the Pileckis, and the Pileckis cross-claimed against Spence and Advanced. Both Advanced and the Pileckis filed amended cross-claims, and Spence dismissed his cross-claim. Advanced's claims that went to the jury were (1) enforcement of the lien; (2) breach of contract; (3) quantum meruit; and (4) conversion. The Pileckis' claims that went to the jury were (1) breach of contract; (2) breach of warranties; (3) fraud; (4) negli-

gence; (5) violation of the HCCA; (6) violation of the UTPA; (7) violation of the DTPA; and (8) abuse of process.

[¶ 9] The jury returned a verdict for Advanced on the quantum meruit claim but awarded no damages on it. The jury found for Advanced on its conversion claim with damages in the amount of $987.26. The jury also returned a verdict for Advanced and Spence on the Pileckis' fraud claim. On all other claims the jury found in favor of the Pileckis. The jury found damages in the amount of $10,415.80 against Advanced on the breach of contract, breach of warranties, and negligence claims. It found damages in the amount of $23,789.46 against Advanced and Spence for the statutory violations. Lastly, it found damages in the amount of $1271.25 against Spence for abuse of process. The court subsequently determined $44,594.25 to be the amount of attorney fees assessed against Advanced and Spence in favor of the Pileckis for the UTPA violation.

## II.  DISCUSSION

### A.  Spence's Personal Liability

#### 1.  Piercing the Corporate Veil

[¶ 10] The jury found Spence individually liable on the abuse of process claim and liable, jointly and severally with Advanced, on the statutory claims. Spence argues that he cannot be held individually liable unless the requirements for piercing the corporate veil are satisfied. We allow the corporate veil to be pierced when the party seeking to do so establishes that the other party "abused the privilege of a separate corporate identity" and "an unjust or inequitable result would occur if the court recognized the separate

---

**3.** Judgment was later entered against McLaughlin in favor of the Pileckis. Although Advanced was not named as a defen-

dant in McLaughlin's complaint against Spence, judgment was entered by agreement against Advanced in favor of McLaughlin.

corporate existence." *State v. Weinschenk*, 2005 ME 28, ¶ 19, 868 A.2d 200, 207. Whether the corporate form should be disregarded involves factual findings that are reviewed for clear error. *See McCain Foods, Inc. v. St. Pierre*, 463 A.2d 785, 787 (Me.1983); *see also Crane v. Green & Freedman Baking Co., Inc.*, 134 F.3d 17, 22–23 (1st Cir.1998).

[¶ 11] Spence argues that because the jury found in his favor on the fraud claim, the jury's verdict on personal liability cannot stand. However, fraud is not a prerequisite to piercing the corporate veil. *See Johnson v. Exclusive Props. Unlimited*, 1998 ME 244, ¶ 8, 720 A.2d 568, 572. While a finding of fraud can make it easier to find that there has been an abuse of the privilege of a separate corporate identity, a jury could find abuse without finding fraud. Furthermore, although the jury did not find that Spence and Advanced committed fraud, the jury did find that they violated the DTPA by engaging in a deceptive trade practice. *See* 10 M.R.S. § 1212.

[¶ 12] Nonetheless, even though there may have been sufficient evidence for the jury to find that Spence had abused the privilege of a separate corporate identity, there was no evidence from which the jury could have found that an unjust or inequitable result would occur if the separate corporate existence were recognized. There was no evidence that the corporation was undercapitalized, insolvent, or bankrupt. *See Weinschenk*, 2005 ME 28, ¶ 20, 868 A.2d at 207. There was no evidence from which the jury could find that a verdict against Advanced would be worth less than a verdict against Spence. Thus, the Pileckis did not satisfy the requirements for piercing the corporate veil.

## 2. Liability Based on the Wrongful Act of a Corporate Officer

[¶ 13] The Pileckis do not argue that there was evidence to warrant piercing the corporate veil. Instead, they argue that piercing the corporate veil is not the only theory for holding corporate employees or agents individually liable to third parties. Corporate officers who participate in wrongful acts can be held liable for their individual acts, and such liability is distinct from piercing the corporate veil. *Donsco, Inc. v. Casper Corp.*, 587 F.2d 602, 606 (3d Cir.1978). The individual liability stems from participation in a wrongful act, and not from facts that must be found in order to pierce the corporate veil. *Id.* Corporate employees who commit an unfair trade practice within the scope of their employment can also be held personally liable. *See Mariello v. Giguere*, 667 A.2d 588, 590–91 (Me.1995) (affirming the personal liability of a corporate employee salesman for fraudulent misrepresentation and suggesting that the employee would be personally liable under the current UTPA, which was not in effect at the time). Furthermore, shareholders of a business corporation can be personally liable for their own acts. 13-C M.R.S. § 623(2) (2005).

[¶ 14] A finding that a corporate officer has participated in a wrongful act is reviewed for clear error. *See Weinschenk*, 2005 ME 28, ¶ 8, 868 A.2d at 204–05 (stating that whether a trade practice is deceptive or unfair is a question of fact and that violations of the UTPA are reviewed for clear error). Factual findings are clearly erroneous when there is no competent evidence in the record to support them. *Id.*

[¶ 15] It was not error for Spence to be held individually liable for abuse of process, and jointly and severally liable with Advanced for the statutory violations. There was evidence that after threatening

the Pileckis that he would do so, Spence himself initiated the filing of the lien that gave rise to the abuse of process claim.[4] Further, there was evidence that Spence's individual representations and conduct before and during construction, and after he stopped working on the house, constituted violations of the HCCA, the UTPA, and the DTPA.

### 3. Liability Based on the Tortious Conduct of an Agent

[¶ 16] In an action for the tortious conduct of an agent, both the agent and the principal can be held liable. RESTATEMENT (SECOND) OF AGENCY § 217B(1) (1958); *County Forest Prods., Inc. v. Green Mountain Agency, Inc.,* 2000 ME 161, ¶¶ 43–44, 758 A.2d 59, 69–70. Actions pursuant to the UTPA and actions for unlawful and deceptive conduct sound in tort. *Drinkwater v. Patten Realty Corp.,* 563 A.2d 772, 774 (Me.1989). The president of a corporation is an agent of the corporation. *See* RESTATEMENT (SECOND) OF AGENCY § 14C cmt. b.

[¶ 17] A finding that an agency relationship exists is reviewed for clear error. *County Forest Prods.,* 2000 ME 161, ¶ 21, 758 A.2d at 65. There was evidence that Spence, as its sole shareholder and president, was an agent of Advanced. For the same reasons that it was not error for Spence to be held personally liable for his individual participation in wrongful acts while a corporate officer, it was not error for Spence to be held personally liable for his individual acts while a corporate agent. Either theory supplies a sufficient basis for Spence's personal liability.

### B. Jury Instruction

[¶ 18] With regard to the breach of contract claims, the court gave the following instruction:

> When one party breaches a contract, the nonbreaching party may, depending on the circumstances, treat the breach as total or partial. But a total breach of a contract is nonperformance of a duty that is so material and so important as to justify the injured party regarding the whole transaction as at an end. If the breach is not sufficiently material and important for this, then the breach is called a partial breach.

> A contract may define a number of rights and duties of each party. The law permits a party to define each other's respective rights and duties as per the contract. A party who fails to perform is called being in breach.

> An owner must allow a contractor to render performance due under a construction contract. Accordingly, an owner may not hinder, obstruct, interfere, or prevent the performance of work by the contractor. A contractor is required to complete its work in a workmanlike manner and in strict compliance with the plans furnished by the owner. A contractor cannot be held liable however for damages that resulted from defects in the owner's specifications.

[¶ 19] Advanced contends that the court erred when it failed to give the jury one of its proposed jury instructions. The proposed instruction provided: "A contractor is permitted to stop work and seek contract damages when the owner fails to make timely progress payments." The court declined to give the instruction because "it was subsumed in the larger in-

---

4. The elements of abuse of process and the facts specific to the abuse of process claim are discussed below.

struction ... which says if a party commits a material breach to the contract that the parties may consider the contract as being terminated."

[¶ 20] When a trial court has given substantially correct instructions we review its refusal to give a requested amplifying instruction for abuse of discretion. *Mixer v. Tarratine Market,* 1999 ME 27, ¶ 6, 724 A.2d 614, 615. We have suggested that a court abuses its discretion when it refuses to give a requested instruction that "(1) states the law correctly; (2) is generated by the evidence in the case; (3) is not misleading or confusing; ... (4) is not otherwise sufficiently covered in the court's instructions"; and (5) when failure to give the instruction results in prejudice to the party that requested it. *Clewley v. Whitney,* 2002 ME 61, ¶ 8, 794 A.2d 87, 90. A court does not abuse its discretion when, after explaining the law using a general instruction, the court "decline[s] to tailor its instructions in detail to fit the particular facts of the case." *Mixer,* 1999 ME 27, ¶ 7, 724 A.2d at 615–16.

[¶ 21] The court did not abuse its discretion when it declined to give Advanced's proposed jury instruction. Although the court declined to instruct the jury specifically regarding a contractor's rights following a breach of contract by a homeowner, the court's instructions sufficiently and accurately conveyed the legal principle at issue, that a material breach of contract permits the other party to treat the transaction as being at an end.

C. Abuse of Process

[¶ 22] Spence contends that there was insufficient evidence for the jury to find him liable for abuse of process. We will uphold a jury verdict if, when viewed in the light most favorable to the prevailing party, "there is any credible evidence in the record to support the verdict." *Sul-*

*livan v. Porter,* 2004 ME 134, ¶ 12, 861 A.2d 625, 631.

[¶ 23] Two elements are required to sustain a claim for abuse of process: (1) "the use of process in a manner improper in the regular conduct of the proceeding," and (2) "the existence of an ulterior motive." *Potter, Prescott, Jamieson & Nelson, P.A. v. Campbell,* 1998 ME 70, ¶ 7, 708 A.2d 283, 286. The filing of a lawsuit qualifies as a regular use of process and cannot constitute abuse of process, even if the filing was influenced by an ulterior motive. *Tanguay v. Asen,* 1998 ME 277, ¶ 5, 722 A.2d 49, 50. Instead, abuse of process claims arise when litigants misuse individual legal procedures, such as discovery, subpoenas, and attachment, after a lawsuit has been filed. *Pepperell Trust Co. v. Mountain Heir Fin. Corp.,* 1998 ME 46, ¶ 14 n. 8, 708 A.2d 651, 655. Abuse of process claims can also arise from the misuse of the procedures for obtaining a lien. *See Kleinschmidt v. Morrow,* 642 A.2d 161, 164 (Me.1994). In *Kleinschmidt,* we affirmed an award of compensatory damages for abuse of process in part because the contractor's lien statement "grossly misstated material facts as to the amount he was owed." *Id.* We suggested that filing a lien statement containing "material misstatements of fact" could constitute abuse of process. *Id.* at 164 n. 3.

[¶ 24] Viewing the evidence in the light most favorable to the Pileckis, there is credible evidence in the record that Spence used the lien process in an improper manner and with an ulterior motive. Approximately one-third of the invoice supporting Spence's lien claim was attributed to the trusses he purchased from McLaughlin and to the electrical rough-in. There was evidence that when Spence included the cost of the trusses and the

electrical rough-in in the lien claim, he knew that he was not entitled to be reimbursed for these items. As Spence admitted at trial, at the time he filed the lien claim, Wells Fargo had already paid him in full for the trusses. Spence was not entitled to payment for the electrical rough-in because, as he conceded, the electrical rough-in was incomplete, and he had an agreement with Wells Fargo that no funds would be disbursed until work was completed to the satisfaction of a Wells Fargo inspector. That there may have been a basis for the rest of the payment Spence demanded in the lien claim does not alter the fact that Spence filed a lien claim that contained material misstatements regarding the amount he was owed. Finally, there was evidence that Spence intended to withhold the Pileckis' access to their house until he received payment and that he used the lien process as a means to secure payment to which he was not entitled.

### D. Attorney Fees

[¶ 25] A person who has suffered a loss of money or property as the result of an unfair or deceptive trade practice under the UTPA may also "be awarded reasonable attorney's fees and costs incurred in connection with said action." 5 M.R.S. § 213(2).

[¶ 26] The Pileckis' attorney submitted an affidavit that stated the number of hours he spent on the case and his hourly rate. The affidavit also stated that the Pileckis had been represented by another attorney at the start of the litigation, and three monthly statements that the first attorney sent to the Pileckis were attached to the affidavit. Advanced and Spence objected to the attorney fee request on the grounds that the Pileckis were not entitled to fees on the claims for which there was no statutory entitlement to fees, including

their defenses to the McLaughlin complaint and to Advanced's cross-claim; the requested amount was unreasonable in comparison to the attorney fees incurred by Spence and Advanced; and the Pileckis failed to show that they were actually obligated to pay their attorney.

[¶ 27] The Pileckis' attorney filed a supplemental affidavit and attached copies of the bills he had sent to the Pileckis. The bills itemize the work with descriptions such as "[r]esearch and draft amended answer to cross-claim," "[t]elephone call from [McLaughlin's attorney] re: facts of case," "trips to and from Corinth to visit client's home," and "[w]ork on document production." The itemizations do not distinguish between claims and parties, although the claim or party can be inferred from a few of the items. For example, it is likely that the telephone call from McLaughlin's attorney involved defending the collection complaint brought by McLaughlin, but it also may have related to background information for the Pileckis' UTPA claim against Spence and Advanced.

[¶ 28] The total amount of fees stated in the attorney's affidavit was $44,594.25, which is the amount the court ordered Advanced and Spence to pay the Pileckis. On appeal, Spence and Advanced contend that the Pileckis are not entitled to attorney fees for time spent on the nonstatutory claims and that the court abused its discretion in failing to apportion the fees between the fee and non-fee claims.

[¶ 29] We review an award of attorney fees for an abuse of discretion. *VanVoorhees v. Dodge*, 679 A.2d 1077, 1082 (Me.1996); *see also Hensley v. Eckerhart*, 461 U.S. 424, 437, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) (stating that the trial court has discretion in determining the amount of fees, given the "court's superior understanding of the litigation and the de-

sirability of avoiding frequent appellate review"). We have said that when analyzing entitlement to attorney fees pursuant to Maine consumer protection statutes, such at the UTPA, the methods of analysis courts use in cases involving the federal civil rights attorney fee provision, 42 U.S.C.A. § 1988 (2003), are appropriate. *Poussard v. Commercial Credit Plan, Inc. of Lewiston,* 479 A.2d 881, 883 (Me.1984).

[¶ 30] Parties are required to apportion their attorney fees between the claims for which fees may be awarded and the claims for which there is no entitlement to fees. *Beaulieu v. Dorsey,* 562 A.2d 678, 679 (Me.1989). Nonetheless, we recognize that "[l]egal services are rarely performed with regard to discrete and identifiable claims within a multi-claim complaint." *Poussard,* 479 A.2d at 885. For cases involving "a common core of facts" and "related legal theories," such as this case, it would be difficult to divide counsel's time on a claim-by-claim basis. *See Hensley,* 461 U.S. at 435, 103 S.Ct. 1933 (analyzing an attorney fee award granted pursuant to 42 U.S.C.A. § 1988).

[¶ 31] We have affirmed an award of attorney fees that was not apportioned between fee and non-fee claims where all the claims arose from the contractor's failure to have a written contract. *William Mushero, Inc. v. Hull,* 667 A.2d 853, 855 (Me.1995). We have also affirmed awards when the trial court apportioned the fee request between fee and non-fee claims, *VanVoorhees,* 679 A.2d at 1082; *Poussard,* 479 A.2d at 885, and we have modified an award to delete the fees for time spent researching punitive damages, which was obviously a non-fee claim, *Beaulieu,* 562 A.2d at 679–80.

[¶ 32] Although the burden is on the party requesting fees to separate the costs of pursuing the fee claims from the costs of pursuing the non-fee claims,

*id.,* when the fee and non-fee claims are related and arise from common facts, they may be so entwined as to make separation impossible. Furthermore, when the fee and non-fee claims arise from the facts surrounding a defendant's unfair or deceptive trade practice, and the fact-finder concludes that the defendant did engage in a violation of the UTPA, the fact that damages can be attributed to a related non-fee claim does not mean that the work done jointly on the fee and non-fee claims should be disregarded in determining the amount of the fees. For cases with related fee and non-fee claims, it is appropriate for the trial court to focus on the overall relief awarded to the prevailing party:

> In these circumstances the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit. Litigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee. The result is what matters.

*Hensley,* 461 U.S. at 435, 103 S.Ct. 1933 (footnote and citation omitted).

[¶ 33] The Pileckis asserted in the trial court that all of their claims arose from the unfair and deceptive trade practices by Spence and Advanced. The case started with the Pileckis having to defend the complaint against them by McLaughlin. That complaint arose from Spence and Advanced's failure to pay McLaughlin's bill for the trusses, even though Spence and Advanced had represented to the Pileckis in the Wells Fargo draw request that the bill had been paid. Next, the Pileckis had to defend the cross-claim filed against them by Spence, in which he claimed that the Pileckis were responsible for the McLaughlin bill and that they had

breached the contract with Advanced. In response, the Pileckis filed their fee and non-fee claims against Spence and Advanced. All of these claims arose out of the common facts surrounding the representations made by Spence when he agreed to construct the house and his actions during and after his work on the house.

[¶ 34] The Superior Court had to determine whether the requested attorney fees were reasonable because the statute authorizes only reasonable fees. 5 M.R.S. § 213(2). It is desirable for a trial court "to provide a concise but clear explanation of its reasons for the fee award," *Hensley*, 461 U.S. at 437, 103 S.Ct. 1933, when the award is opposed. However, Spence and Advanced did not request a hearing with regard to the amount of fees and they did not request findings after the court made its decision. Although Spence and Advanced contend that the trial court abused it discretion in not apportioning fees to the fee claims, they did not assist the trial court by pointing to any specific items in the legal bills for which the Pileckis were not entitled to payment. By making the award that it did, the court obviously concluded that the amount represented a reasonable fee. We assume that in reaching its determination of the fee amount, the court took into consideration both the relatedness of the fee and non-fee claims and the result that the Pileckis obtained from the lawsuit. We conclude that the Superior Court acted within its discretion by awarding attorney fees in the amount of $44,594.25.

[¶ 35] The Pileckis also request an award of attorney fees for the time expended on this appeal. Because they have prevailed on appeal, the Pileckis are entitled to fees for the appeal. *Beaulieu*, 562 A.2d at 680. "The determination of the reasonable fee, however, is a factual mat-

ter for the trial court." *Id.* (remanding to the trial court to determine the amount of fees for the appeal).

The entry is:

Judgment affirmed. Remanded for determination of attorney fees on appeal.